**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

PATRICIA BISANG,

                                        Plaintiff,                    1:20-cv-195 (BKS/DJS)

v.

NEW YORK STATE EDUCATION DEPARTMENT,
CHRISTOPHER SURIANO, CATHRYN TISENCHEK,
CASSANDRA ALLISON, and JOANNE LACROSSE,

                                        Defendants.

**Appearances:**

*For Plaintiff:*
Sarah J. Burger
Burger Law Group PLLC
433 Broadway, Suite 301
Saratoga Springs, NY 12866

*For Defendants:*
Letitia James
Attorney General of the State of New York
Shannan C. Krasnokutski
Assistant Attorney General, of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        Plaintiff Patricia Bisang brings this action against Defendants New York State Education

Department, Christopher Suriano, Cathryn Tisenchek, Cassandra Allison, and Joanne LaCrosse,

asserting claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et. seq.,

and the New York State Human Rights Law, N.Y. Exec. Law § 290 et. seq. ("NYSHRL"). (Dkt.

No. 14 (amended complaint)). Presently before the Court is Defendants' motion pursuant to Federal Rule of Civil Procedure 56 for summary judgment as to all of Plaintiff's claims. (Dkt. No. 52). The motion is fully briefed. (Dkt. Nos. 57, 59). For the following reasons, Defendants' motion is granted.

## II.     FACTS[1]

### A.     Plaintiff's Employment with SED

Plaintiff is a 71-year-old woman who was employed by the New York State Education Department ("SED") between 2004 and 2018. (Dkt No. 52-36, ¶ 1; Dkt. No. 57-1, ¶ 1; Dkt. No. 57-6, ¶ 2).[2] Plaintiff has a master's degree in special education and worked as a physical education and health teacher before transitioning to special education. (Dkt. No. 57-8, at 17–22). Plaintiff's first position at SED was in the Brooklyn office as a Regional Associate, a provisional "Grade 26" position. (Dkt. No. 52-36, ¶ 2; Dkt. No. 57-1, ¶¶ 2, 65). Plaintiff subsequently transferred to the Albany office and continued to work as an Associate. (Dkt. No. 52-36, ¶ 3; Dkt. No. 57-1, ¶ 3). In 2010 or 2011, Plaintiff's role changed from a Grade 26 Associate position to a Grade 22 Assistant position, and she was reassigned to SED's Policy Unit to work under the supervision of Defendant Joanne LaCrosse. (Dkt. No. 52-36, ¶¶ 4–5; Dkt. No. 57-1, ¶¶ 4–5).

In or around September 2014, upon Plaintiff's request to leave the Policy Unit, she was transferred to the Due Process Unit to work under the supervision of Defendant Cathryn Tisenchek, the supervisor of the Due Process Unit. (Dkt. No. 52-36, ¶¶ 6–7; Dkt. No. 57-1, ¶¶ 6–

---

[1] The facts are drawn from Defendants' statement of material facts and Plaintiff's response to Defendants' statement of material facts and statement of additional material facts in dispute (Dkt. Nos. 52-36, 57-1), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The Court does not consider Plaintiff's statement of additional material facts to the extent the facts asserted are supported by citations to evidence which is not in the record before the Court. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[2] SED receives federal funding in the form of Individuals with Disabilities Education Act grants. (*See* Dkt. No. 52-16, at 26–29 (Suriano deposition testimony)).

7, 67; Dkt. No. 52-17, ¶ 1). Plaintiff asserts that she made this transfer request because LaCrosse gave her minimal work to perform. (Dkt. No. 57-8, at 59–60). As an Assistant in the Due Process Unit, Plaintiff was responsible for monitoring the impartial hearing reporting system. (Dkt No. 52-36, ¶ 8; Dkt. No. 57-1, ¶ 8).

During Plaintiff's tenure in the Due Process Unit, LaCrosse was Tisenchek's direct supervisor. (Dkt. No. 52-36, ¶ 9; Dkt. No. 57-1, ¶ 9). Defendant Christopher Suriano, Assistant Commissioner of the Office of Special Education, was LaCrosse's direct supervisor. (Dkt. No. 52-36, ¶ 10; Dkt. No. 57-1, ¶ 10; Dkt. No. 52-15, ¶¶ 1, 4). During the relevant time period, Defendant Cassandra Allison was the Director of Labor Relations in the Office of Human Resources Management ("OHRM"). (Dkt. No. 52-1, ¶ 1).

### B.      Plaintiff's Disabilities and 55-b Status

Plaintiff asserts that she was first diagnosed with anxiety because of workplace stresses between 2004 and 2008. (Dkt. No. 57-6, ¶ 4). Plaintiff's anxiety "can often be debilitating," causing her to vomit, shake, and sometimes lay down flat to recover from an episode. (*Id.* ¶ 5). In addition, her anxiety can present with "behavioral oddities" such as "an unusual laugh, facial tics[,] and staring." (*Id.*). To manage her anxiety, Plaintiff goes to therapy and takes Prozac/Fluoxetine; the medication also helps to manage her vomiting. (*Id.* ¶ 6). If her anxiety is particularly severe, she takes Clonazepam. (*Id.*).

Plaintiff was also diagnosed with hypokalemic periodic paralysis in 2008 after a series of falls. (*Id.* ¶ 7). This condition can cause serious falls, and Plaintiff asserts that the condition "makes walking upstairs difficult" and "exacerbates [her] anxiety due to the constant fear of falling." (*Id.* ¶ 8). Plaintiff testified at her deposition that her hypokalemic periodic paralysis "causes anxiety and anxiety causes vomiting." (Dkt. No. 57-8, at 195). Because of her paralysis,

Plaintiff faces embarrassment and no longer wants to travel. (*Id.* at 192–93). To manage the condition, Plaintiff takes Diamox daily. (Dkt. No. 57-6, ¶ 9).

From 2008 until the end of her employment at SED, Plaintiff was employed under the "55-b Program," which is designed to promote the employment of persons with disabilities by New York. (Dkt. No. 57-6, ¶ 15).[3] Plaintiff testified that, shortly after she was transferred to the Due Process Unit in 2014, she asked both Tisenchek and LaCrosse if she could "stay on the first floor near the bathroom" because of her propensity to vomit. (Dkt. No. 57-8, at 156). Tisenchek and LaCrosse refused this request and told Plaintiff that she would have to request an accommodation from Human Resources. (*Id.*). Plaintiff subsequently spoke with Steve Earle, the "head of accommodations," who denied Plaintiff's accommodation request and told her to "throw up in the garbage can." (*Id.*; *see also* Dkt. No. 57-6, ¶¶ 22–23).

### C.     Events in 2015 and 2016

In March 2015, Tisenchek received complaints from employees Debra Rivera and Darrin Flynn about Plaintiff's staring behavior. (Dkt. No. 52-17, ¶ 18). In an email to Tisenchek, Rivera wrote: "Several times on 3/11 & 3/12/15, [Plaintiff] leans over the mezzanine and just stares down at me while I am working. I feel as though she is intim[id]ating me, threatening me[,] and bullying me. I can't refocus because she has me so UPSET." (Dkt. No. 52-24).[4] Flynn complained that Plaintiff was giving him "dirty looks" and "staring at [him]." (Dkt. No. 52-25). He wrote that he felt Plaintiff was "trying to intimidate [him] for some reason" and that her

---

[3] Section 55-b of the Civil Service Law provides that the "commission may determine up to seventeen hundred positions with duties such as can be performed by persons with a physical or mental disability who are found otherwise qualified . . . ." N.Y. Civil Serv. Law § 55-b(1). Such positions "shall be classified in the noncompetitive class, and may be filled only by persons who shall have been certified by the employee health service of the department as being a person with either a physical or mental disability." *Id.*

[4] This email was sent around the time that Plaintiff and Rivera had a disagreement regarding Plaintiff's membership status in the office "water club." (*See* Dkt. No. 57-8, at 87–93).

behavior was "starting to make [him] a bit uncomfortable." (*Id.*). Tisencheck conducted a counseling session with Plaintiff on March 12, 2015 and discussed a report that Plaintiff had spoken to Rivera "in a harsh and threatening manner." (Dkt. No. 52-26, at 2). Tisenchek informed Plaintiff that "it was not appropriate to speak in such a manner to any colleague or fellow staff member." (*Id.*). According to Tisenchek's documentation of the counseling session, Plaintiff denied speaking or acting in a threatening manner. (*Id.*; *see also* Dkt. No. 57-8, at 90 (Plaintiff deposition testimony denying that she "yelled at [Rivera] aggressively")).[5]

By letter dated July 21, 2015, employee Tina Lieberman-Cohen complained to Tisenchek of aggressive verbal harassment by Plaintiff. (Dkt. No. 52-27). Lieberman-Cohen wrote that in response to two emails she had just sent Plaintiff, Plaintiff "stomped loudly down the stairs," "stood within one foot of me, held her eyeglasses in her hand, and proceeded to shake her eyeglasses at me while using a loudly raised and threatening voice." (*Id.* at 1). Plaintiff "was clearly agitated" and her "message" was that Lieberman-Cohen "should not be telling [Plaintiff] how to do her job." (*Id.*). Lieberman-Cohen considered Plaintiff's behavior to constitute "bullying, berating[,] and humiliat[ion]." (*Id.* at 1–2). Plaintiff testified at her deposition that she has no recollection of any incident with Lieberman-Cohen or ever yelling at her. (Dkt. No. 57-8, at 110–11). On July 24, 2015, employee Sharon Veltman reported in writing to Tisenchek about comments made by Plaintiff. Veltman reported that Plaintiff said that she was upset with Liberman-Cohen and that Plaintiff said she "blew up in [Lieberman-Cohen's] face." (Dkt. No. 52-28). During Plaintiff's description of the incident to Veltman, Plaintiff stated "multiple

---

[5] At some point in time, employee Patty Rosa-Farleigh was asked to make a statement regarding Plaintiff's staring over a banister. (Dkt. No. 57-3, at 6). Although asked repeatedly by LaCrosse and Tisenchek, Rosa-Farleigh denied feeling threatened, but ultimately said that Plaintiff's behavior was "a little uncomfortable." (*Id.*). She later was apologetic for making this statement, believing that it was "unnecessary" and "mean-spirited." (*Id.* at 8).

times": "I'm going to kill her; I'm just going to kill her." (*Id.*). Plaintiff testified that she did not

recall using these words or "having any things with [Veltman]." (Dkt. No. 57-8, at 114–15).

On September 30, 2015, following Plaintiff's first year in the Due Process Unit,

Tisenchek completed a performance review for Plaintiff with an unsatisfactory rating. (Dkt. No.

52-19). In the review, Tisenchek noted Plaintiff's "strong computer skills" but further stated:

"Upon joining the Unit in September 2014, [Plaintiff] often stated how easy her job is and that

anyone could do it. However, she has needed direction and guidance in order to accurately

perform her duties." (*Id.* at 2). Tisenchek also wrote:

> There have been several instances where [Plaintiff] has become
> defensive, angry[,] and hostile when her work has been questioned
> and/or corrected, feeling that she was being personally attacked and
> harassed. At times, [Plaintiff] has acted outside of established
> procedures by failing to adhere to the use of standard, consistent
> language . . . despite repeated discussions during Team meetings.

(*Id.*). Plaintiff generally denies these statements are true and asserts that Tisenchek often

complimented her work and computer skills. (*See, e.g.*, Dkt. No. 57-8, at 73).

On March 29, 2016, Tisenchek emailed Plaintiff regarding her failure to use standard

language to respond to an impartial hearing officer ("IHO"). (Dkt. No. 52-20, at 1 ("In addition,

the standard response to an IHO . . . was not used." (emphasis omitted))). Tisenchek wrote that

the "standard language that we have all agreed to use[] must be used no matter what." (*Id.*

(emphases omitted)).

### D.     Events in 2017 and Early 2018

#### 1.     Due Process Monitoring

On October 10, 2017, Tisenchek sent Plaintiff an email highlighting errors in notices that

Plaintiff had entered in the Due Process Unit monitoring system. (Dkt. No. 52-21). Tisenchek

wrote, for example, that Plaintiff entered notices reading "This case non enters non-significant

6

non-compliance." (*Id.*). Tisenchek wrote that even changing this text to read "This case now enters significant non-compliance" would not be correct, as the Unit had agreed to use different language. (*Id.* ("If the case is not updated in IHRS within 7 days, the case will enter significant non-compliance status.")). Although Plaintiff argues that her errors were "grammatical and in form, not substantive," she does not otherwise dispute this email or the underlying facts. (*See* Dkt. No. 57-1, ¶ 15).

On December 1, 2017, Tisenchek emailed Plaintiff advising her that Plaintiff had made a change in the monitoring system that should have been made by the school district. (Dkt. No. 52-22, at 1). After citing information "impl[ying] that [Plaintiff] changed the case closure type from insufficient to withdrawn rather than the district making this change," Tisencheck wrote that "[f]urther investigation indicate[d] that the case closure type was changed by [Plaintiff] rather than the district." (*Id.*). Plaintiff's December 1, 2017 response to Tisencheck's email stated:

> You are mistaken by this email. . . . I stay on the phone with many data changes and walk them through it. As I delete it they enter the information. This is done for those emails/data changes that are combined together. No one is doing anything wrong. When I get off of the phone I always send the email back that it is completed. That is the format for a data change. I say your data change to change from insufficient to withdrawn is completed. That does not mean that I did it!

> I have gathered, about the emails going back and forth about missing emails, deleted emails, not answereing [sic] emails, dated emails that we were cc on [sic] is now about a witch hunt. Please be assured that I am cc [sic] both Chris [Suriano] and Joanne [LaCrosse] on this and you have spent the better part of last week hunting fo[r] anything and I mean anything I could do wrong. . . . Two meetings per week and a third with IT. It is to the point of rediculous [sic]. These meeting [sic] are not for us but for you to understand the system for nyc which is broke.

(Dkt. No. 52-23, at 1). Plaintiff wrote that she had asked Suriano for a meeting the following week "and now Due to all this nonsense [was] going to request that the commissioner be

present." (*Id.* ("I am keeping this email for posterity, the commissioner, and any upcoming lawsuit.")).

Plaintiff testified generally at her deposition that she was not able to perform certain changes that were made to the technology used in the monitoring process. (Dkt. No. 57-8, at 225–28). Specifically, in response to the question of whether Plaintiff thought she was unable to do the work, Plaintiff replied: "It's not a thought. I knew I couldn't do it." (*Id.* at 227). Plaintiff also testified that there was no training for monitoring, stating: "They tried to show me, and I couldn't do it. I literally couldn't do it. I didn't comprehend it." (*Id.* at 228–29 ("It was a very technical I.T. thing they were doing.")).

### 2.   Alleged Work Absences

On December 26, 2017, Tisenchek emailed Plaintiff noting that Plaintiff had left work without approval on two occasions and requesting that Plaintiff not do so again in the future. (Dkt. No. 52-29, at 2). More specifically, Tisenchek wrote that (1) Plaintiff left work early on December 15, 2017, even though her request to do so had not been approved, and (2) Plaintiff left work early on December 22, 2017 with no record of a leave request. (*Id.*). Plaintiff responded the next day, copying Suriano and LaCrosse and stating that she would "address each of these accusations of bullying." (*Id.* at 1). Plaintiff explained that she looked "all over" for Tisenchek on December 15 but could not find her to get her leave request approved and ultimately "had to leave." (*Id.*). Plaintiff wrote: "Cathy, supervisors who are well educated, have empathy and are well verse [sic] on social emotional learning do not behave this way and waste time on such nonsense." (*Id.*). With regard to December 22, Plaintiff wrote that she had finished all of her Due Process Unit work and was working on "another assignment given to [her] by administration to complete for transition/indicator 13," thus suggesting that she did not in fact leave work early that day. (*Id.*). Plaintiff continued: "You have nothing to do with this and/or are you supervising

me concerning this matter.  . . . Again, you have nothing to do with this, have no authority over

me to complete it and or the way/time I do it." (*Id.*). Plaintiff concluded her email by saying:

"Chris and Joanne please set up a meeting for next week after the second of January. In addition,

due to this bullying email, I must take tomorrow and Friday off as personal days to get my work-

group assignment on Transition completed due to the harassment during the day at work!!!!" (*Id.*

at 2). Plaintiff's email does not mention any claimed disability, any signs or symptoms of a

disability, or her 55-b status. (*See id.* at 1–2).

On December 28, 2017, Tisenchek emailed Plaintiff requesting that Plaintiff provide the

name of the individual with whom she was working on December 22, 2017 "to verify what

[Plaintiff] reported" on her timesheet. (Dkt. No. 52-30, at 1). Plaintiff responded:

> As far as reporting to you were [sic] I am when working on transition
> is none of your concern. I am requesting that the commissioner be
> brought in on this due to your bulleying [sic] and unprofessional
> behavior. Chris – Joanne please set up this appointment. I am
> requesting this for next week. Cathy you need to be removed from
> your position!

(*Id.*). In connection with her December 28, 2017 email to Tisenchek, Plaintiff testified at her

deposition as follows:

> Q: . . . So we talked a little bit earlier about insubordination, you're
> ask – you're being asked to provide your supervisor with the name
> of an individual here, correct?
>
> A: Correct. And I won't give it to her.
>
> Q: That's correct. Your – that's not complying with a director order,
> isn't it?
>
> A: I wouldn't give it to her, no. Be very honest about that.

(Dkt. No. 57-8, at 172–73).

Tisenchek emailed Plaintiff on January 2, 2018 again asking Plaintiff to "provide information on where [she] was working, and with whom, from 3:40 p.m. to 4:00 p.m. on Friday December 22, 2017 in order to verify the information entered on [her] timesheet for that date." (Dkt. No. 52-31, at 2 (noting that "a Supervisor is expected to monitor and enforce Time and Attendance leave rules")). Plaintiff responded the same day, writing: "This assignment is not from you, nor do I report to you for it. I am a professional and you do not treat people as professionals. You treat people like the[y're] dirt under your feet!!!" (*Id.* at 1). Plaintiff concluded the email by stating: "Chris – Joanne I will see the commissioner[']s office for a meeting tomorrow. . . . There is nothing more I can do w[i]th this very unhealthy women [sic]." (*Id.*). The next day, Plaintiff sent another email to Tisenchek, copying Suriano and LaCrosse, indicating that she would fix her timesheet. (Dkt. No. 52-32). Plaintiff wrote the email "after speaking with several management" and described what, in Plaintiff's view, constitutes professionalism. (*Id.*). Plaintiff concluded: "It is unfathomable that I must work for such an unprofessional woman as you that unfortunately has no social emotional skills." (*Id.*).

Plaintiff testified at her deposition that she "viewed everything [Tisenchek] did as harassment and bullying," (Dkt. No. 57-8, at 228), including the time that Tisenchek un-submitted her timesheet, (*id.* at 147), and questioned her attendance, (*id.* at 104). Plaintiff recognized that it was Tisenchek's responsibility, as supervisor, to monitor and sign off on attendance, and stated that even if Tisenchek questioned the attendance of everyone else in the unit, she would still feel bullied if her attendance was questioned. (*Id.* at 148). Plaintiff also felt bullied when Tisenchek would "contradict" things Plaintiff said or was "sarcastic." (*Id.* at 72).

### 3.     Other Events

In November 2017, Plaintiff received an email instructing her to open up a state credit card. (*Id.* at 53). Plaintiff filled out the paperwork and brought it to Tisenchek for approval. (*Id.*;

Dkt. No. 52-17, ¶ 24). Tisenchek asserts that she declined to approve the credit card because Plaintiff's job "did not involve travel" and that Plaintiff "appeared extremely upset by [the] refusal to approve issuance of the travel card at that time." (Dkt. No. 52-17, ¶¶ 25, 26). According to Plaintiff, however, Tisenchek asked why Plaintiff wanted a state credit card and "accused" Plaintiff of wanting the credit card "to go shopping." (Dkt. No. 57-8, at 53). Plaintiff testified that she left this interaction and "began vomiting at [her] desk." (*Id.* at 54).

On December 28, 2017, Plaintiff sent an email to Suriano and LaCrosse, copying Rivera, requesting to be removed from any meetings in the Due Process Unit due to "abuse, harassment and mismanagement of a bullying supervisor." (Dkt. No. 52-16, at 56–57; Dkt. No. 57-6, ¶ 30).[6] Plaintiff wrote that she would not attend a scheduled Due Process Unit meeting "due to request by a doctor in a fifty-five B in place with the Office of Civil Service due to extreme vomiting under stressful situations and paralysis." (Dkt. No. 52-16, at 57; Dkt. No. 57-6, ¶ 30 (Plaintiff's declaration asserting that in this email she "requested that [she] not attend any meeting with [her] bullying supervisor as to not exacerbate [her] disability")). It appears that this email exchange was ultimately forwarded to Human Resources. (*See* Dkt. No. 52-16, at 60 (Suriano testifying at deposition that Human Resources was "alerted")). Plaintiff asserts that her concerns "were not addressed by anyone at NYSED" and that she "was never interviewed by HR or anyone investigating [her] complaints." (Dkt. No. 57-6, ¶ 31). Tisenchek similarly testified at her deposition that she was never interviewed by HR "with respect to [Plaintiff's] allegations of harassment and bullying by a supervisor" and that she did not ask Plaintiff "what she meant by those words." (Dkt. No. 52-18, at 94).

---

[6] Although Suriano read from this December 28, 2017 email during his deposition and Plaintiff references the email in her declaration, (Dkt. No. 52-16, at 56–58; Dkt. No. 57-6, ¶ 30), the email itself is not in the record before the Court.

Plaintiff testified at her deposition that Tisenchek referred to her hands shaking, which Plaintiff asserts is a symptom of her anxiety, "a couple of times." (Dkt. No. 57-8, at 154).[7] For instance, during a meeting in 2017, Tisenchek commented on Plaintiff's shaky hands by asking "what was wrong with [Plaintiff]." (Dkt. No. 57-6, ¶ 21; *accord* Dkt. No. 57-8, at 154). According to Plaintiff, Tisenchek "continuously mimicked everything [Plaintiff] said or did throughout [her] tenure in the Due Process Unit," and Tisenchek and LaCrosse "mock[ed] that [Plaintiff] went to church each day on [her] lunch break." (Dkt. No. 57-6, ¶ 25). At her deposition, Plaintiff was unable to provide any specific examples of Tisenchek's mimicking. (Dkt. No. 57-8, at 72–73). Plaintiff also recalls Tisenchek asking "Do you always have to wear those earbuds?!" even though Plaintiff had explained to Tisenchek that she listened to soft music to "ease [her] anxiety." (Dkt. No. 57-6, ¶ 26). Plaintiff does not indicate when Tisenchek made this statement. (*See id.*).

Plaintiff spoke with Suriano almost daily and "told him of the harassment [she] felt [she] faced" as "conditions worsened throughout 2017." (Dkt. No. 57-6, ¶ 28). Plaintiff "constantly" asked Suriano for a transfer out of the Due Process Unit. (Dkt. No. 57-8, at 159–60; Dkt. No. 57-6, ¶ 28). Plaintiff asserts that her requests to transfer were ignored. (Dkt. No. 57-6, ¶ 28). Suriano testified at his deposition that "we looked into availability in . . . other units" but that there were not any available positions to which Plaintiff could be transferred. (Dkt. No. 52-16, at 42). Suriano informed Plaintiff that "there was no ability [to transfer] and that her services were needed in the due process unit." (*Id.* at 43). He further testified that Plaintiff never made a

---

[7] Plaintiff also testified that LaCrosse "once made a statement regarding [her] hands shaking" when Plaintiff was part of LaCrosse's unit, i.e., before Plaintiff's transfer to the Due Process Unit in 2014. (Dkt. No. 57-8, at 154). LaCrosse does not recall ever talking to Plaintiff about her hands shaking. (Dkt. No. 52-14, at 55).

"formal request" to transfer and that when Plaintiff would inquire whether there were "any openings yet," he would tell her no. (*Id.* at 43–45).

On January 9, 2018, employees Mavis Kirk and Sharon Veltman reported to Tisenchek that Plaintiff moved very close to Kirk in her cubicle, swung her arms and hands, and repeatedly shouted when discussing a work issue. (Dkt. No. 52-17, ¶ 36). Kirk completed an employee incident report in which she wrote that Plaintiff had approached her work area, "used curse words (unclear exactly what she said because she was so angry)," and approached Kirk's desk again the next morning "in a heightened state of anger about work she was indicating she was refusing to do." (Dkt. No. 52-33, at 1). Veltman, who was at Kirk's cubicle, also completed an employee incident report in which she wrote that Plaintiff stated repeatedly in a loud voice: "I'm done!" (Dkt. No. 52-34, at 2). Veltman "felt very anxious and frightened as to what [Plaintiff] may do as her volume was increasing [and] her hands and arms were becoming more exaggerated in their movements." (*Id.*). Plaintiff testified at her deposition that she did not recall this incident, and was never shown or asked to sign the incident reports. (Dkt. No. 57-8, at 231–32). She further testified that she "[v]aguely" remembered Veltman and did not know who Kirk was. (*Id.*).

### E.   January 10, 2018 Incident and Aftermath

Early on January 10, 2018, Tisenchek emailed Plaintiff and attached a document detailing performance expectations for SED staff. (Dkt. No. 52-35). The performance expectations included, among others, demonstrating "collegial and professional behavior," treating and speaking to "colleagues and Supervisor respectfully at all times even when voicing a concern about something," and following the chain of command. (*Id.* at 2). Plaintiff responded to Tisenchek's email approximately twenty minutes later, stating, "Those expectations are expected

from supervisors as well. You give no respect to your employees on a continuous basis. This is a matter for HR." (*Id.* at 1).

Later in the afternoon on January 10, Plaintiff spoke with Rivera, Suriano's receptionist. According to Plaintiff, Plaintiff asked Rivera to ask Suriano "to do something about Tisenchek and to keep her away from [Plaintiff]." (Dkt. No. 57-6, ¶ 32). Plaintiff further explained to Rivera that she "was at the end of [her] rope." (*Id.*; *see also* Dkt. No. 57-8, at 247–49 (Plaintiff testifying at deposition that she told Rivera that "[Tisenchek] has been on my back and will not get off" and "please ask [Suriano] to speak with her")). According to Rivera, however, Plaintiff "started yelling and pointing toward the Supervisor office stating she was going to kill [Tisenchek] and for me to make sure I told Chris Suriano." (Dkt. No. 52-5 (Rivera witness statement); *see also* Dkt. No. 57-5, at 10 (Rivera deposition testimony that Plaintiff was "screaming that she was going to kill Cathy Tisenchek and for me to tell Chris Suriano that she told me to tell him that she was going to kill Cathy Tisenchek")). Employees Heather Rookey and Deborah Trimarchi also heard Plaintiff that afternoon. Rookey stated that Plaintiff, who seemed "disgruntled and upset," said that she was "going to kill [herself] today." (Dkt. No. 52-6). Rookey did not consider Plaintiff's threat to kill herself to be serious, but thought Plaintiff was "frustrated." (Dkt. No. 57-4, at 6). Trimarchi "got the impression [Plaintiff] was upset about work" but did not report hearing Plaintiff make any threat against herself or others. (Dkt. No. 57-5, at 30). Plaintiff denies threatening to kill Tisencheck or herself on January 10. (*E.g.*, Dkt. No. 57-6, ¶ 34). According to Suriano, Rivera advised him that Plaintiff had stated that she would kill Tisenchek and then kill herself. (Dkt. No. 52-15, ¶ 9; Dkt. No. 52-16, at 87).[8] Suriano notified

---

[8] Plaintiff disputes that Rivera reported to Suriano that Plaintiff said she would kill herself, because Rivera's witness statement indicates only that Plaintiff threatened to kill Tisenchek. (*See* Dkt. No. 57-1, ¶¶ 44, 98).

LaCrosse, "quickly asked" Rookey who "confirmed that she heard the same information" as
Rivera, and notified OHRM by calling Annette Franchini, the Director of Human Resources
Management for SED. (Dkt. No. 52-16, at 87–88; Dkt. No. 52-15, ¶¶ 11–13).

The following day, January 11, Franchini "received an email from an employee under
[her] supervision advising that supervisor Cathryn Tisenchek wished to meet with someone in
Human Resources regarding a reported threat to her life made by [Plaintiff] on January 10,
2018." (Dkt. No. 52-3, ¶ 6). Franchini advised Allison to speak with Plaintiff and Suriano "to
investigate the allegations regarding the threatening statements." (*Id.* ¶ 7). Plaintiff was
summoned to OHRM for a meeting with Allison. (Dkt. No. 52-36, ¶ 46; Dkt. No. 57-1, ¶ 46).
Allison asked Plaintiff whether she had threatened to kill her supervisor and herself but does not
recall whether Plaintiff "admitted making the statements in question." (Dkt. No. 52-1, ¶ 5).
Plaintiff testified that she denied making any such threats. (Dkt. No. 57-8, at 268).

Based on "the nature of the statements in question, [Allison's] understanding of SED
procedure, and [her] observation of [Plaintiff's] behavior during [the] meeting," Allison "made a
determination to call Albany Mobile Crisis Unit to evaluate [Plaintiff]." (Dkt. No. 52-1, ¶ 6; *see*
Dkt. No. 52-2, at 109–10 (Allison testifying at deposition that there was an "immediate concern"
regarding the health and safety of Plaintiff and other staff)). Prior to calling the Albany Mobile
Crisis Unit, Allison spoke with her supervisor, Franchini, who agreed with the decision to call.
(Dkt. No. 52-1, ¶ 7; Dkt. No. 52-3, ¶¶ 9–11 (Franchini declaration)). According to Franchini,
standard procedure is to "err on the side of caution" and place a call to the Albany Mobile Crisis
Unit to determine the "appropriate course of action" if a person "displays behavior
demonstrating that he or she may pose a threat to him or herself or to others." (Dkt. No. 52-3,
¶ 12). The Albany Mobile Crisis Unit then makes an "independent judgment regarding whether

an individual in crisis should absent him or herself from the workplace to seek psychiatric care." (*Id.* ¶ 13). If an individual displaying dangerous behavior chooses not to voluntarily depart with the Albany Mobile Crisis Unit, SED policy is to "place the individual on involuntary leave and remove the individual from the workplace pending the results of a psychological examination performed by the Department of Civil Service['s] Employee Health Services [("EHS")]." (*Id.* ¶ 14).

The parties dispute what transpired when the Albany Mobile Crisis Unit arrived at SED to evaluate Plaintiff on January 11. According to the Mobile Crisis Unit's contact note,[9] Allison reported the alleged threats and that Plaintiff had been "increasingly paranoid and angry over the last 3 weeks" and had "voiced delusions about dishonest business practices and how the agency is 'covering this up.'" (Dkt. No. 57-12). Plaintiff presented as "guarded and aloof" and denied making any statements about killing herself or her supervisor. (*Id.*). Plaintiff "spen[t] some time informing [the Unit] of all the illegal and dishonest practices occurring at the agency." (*Id.*). The Mobile Crisis Unit "contact[ed] [its] supervisor to consult," and the supervisor recommended that Plaintiff be transferred to the hospital "due to collateral reports of suicidal and homicidal statements and [Plaintiff's] apparent disorientation" about dates. (*Id.*). The Unit requested that Plaintiff go to the hospital for medical clearance, and Plaintiff "refuse[d]." (*Id.*). The Unit thereafter contacted the Albany Police Department for assistance and, when the police arrived, Plaintiff "then agree[d] to go to [the hospital] voluntarily and [wa]s transported by" the Mobile Crisis Unit. (*Id.*). Franchini testified at her deposition that Allison informed her that Plaintiff decided to "voluntarily absent herself from the workplace and go with Albany Crisis." (Dkt. No.

---

[9] Defendants argue that this document is unauthenticated hearsay but also "fully contradicts" Plaintiff's claims. (Dkt. No. 59, at 12).

52-4, at 102). Allison also told Franchini that Allison did tell Plaintiff that "if she chose not to go with Albany Crisis that, because her words were threatening, [Allison] was going to absent [Plaintiff] from the workplace pending the results of an EHS exam." (*Id.*).

According to Plaintiff, however, she was "surprise[d]" when two police officers appeared, and she was informed by Allison and the Mobile Crisis Unit that she "was to go to the hospital for an evaluation." (Dkt. No. 57-6, ¶ 38). Plaintiff indicated that she did not want to leave, but Allison told Plaintiff she "did not have a choice in the matter and if [she] did not leave, [she] would be forcibly removed." (*Id.*; *see also* Dkt. No. 57-8, at 271 (Plaintiff testifying at deposition that she was told "we're not going to give you any choice, you're going")). It is undisputed that Plaintiff was transported to the hospital for evaluation.

Plaintiff asserts that, following her stay at the hospital, she did not hear from SED until January 25, 2018, when she was asked for medical documentation for her absence. (Dkt. No. 57-6, ¶ 42). Plaintiff further asserts that she received word on March 23, 2018 that she would be on "unauthorized, unpaid leave effective January 12, 2018, due to inadequate documentation." (*Id.* ¶ 43).[10] Although Plaintiff and her doctor sent "multiple letters to NYSED, repeating that [Plaintiff] was ready, willing and able to return to work," she was not evaluated by EHS until May 4, 2018. (Dkt. No. 57-6, ¶ 44; Dkt. No. 52-7; Dkt. No. 57-11). By letter dated June 6, 2018, the EHS provider who evaluated Plaintiff on May 4 informed Human Resources that Plaintiff was "fit to perform the essential duties of an Assistant in Education of Children with Disabilities." (Dkt. No. 52-7).

---

[10] Plaintiff does not indicate who from SED contacted her.

### F.       Notice of Discipline and Plaintiff's Resignation

Franchini asserts that, following Plaintiff's departure from the workplace, OHRM

conducted an investigation of the events of January 10, 2018 and collected witness statements

from Rivera and Rookey. (Dkt. No. 52-3, ¶ 16; *see* Dkt. Nos. 52-5, 52-6). After receiving

Plaintiff's medical clearance, Human Resources conducted an interrogation of Plaintiff on June

25, 2018. (*See* Dkt. No. 57-9 (interrogation transcript)).[11] SED filed a notice of discipline against

Plaintiff on July 3, 2018 and an amended notice of discipline on July 5, 2018. (Dkt. Nos. 52-8,

52-9). Plaintiff was charged with misconduct and/or incompetence for yelling at and making

threatening statements to her co-workers on January 10, 2018 and with making several materially

false statements during the June 25, 2018 interrogation. (Dkt. No. 52-9, at 1–4). The proposed

penalty was termination. (*Id.* at 4). Plaintiff filed a grievance in response. (Dkt. No. 57-8, at 286–

87).

The disciplinary charges against Plaintiff were resolved on October 11, 2018 by a

Stipulation of Settlement entered into by Plaintiff and SED. (Dkt. No. 52-10; *see id.* at 3

(showing that Plaintiff and Michael Livolsi from OHRM signed the stipulation)). SED agreed to

make certain adjustments to Plaintiff's sick leave accruals and payroll status, and Plaintiff agreed

to "irrevocably resign" her position with SED effective January 3, 2019. (*Id.* ¶¶ 1–4). In

accordance with this stipulation, Plaintiff signed a resignation later dated October 10, 2018, in

which she "irrevocably resign[ed]" her position. (*Id.* at 5). Plaintiff asserts that she was "forced"

and "pressured" to retire early, and that her early retirement has prejudiced her financially. (Dkt.

No. 57-6, ¶¶ 46–48). Plaintiff also asserts that the "harassment and loss of [her] employment has

---

[11] Based on the transcript of the interrogation, it appears that the interrogation was conducted by Michael Livolsi, Assistant Director of Labor Relations in OHRM, and that Plaintiff's union representative and attorney were also present. (*See* Dkt. No. 57-9, at 1–2).

caused [her] more anxiety and depression" and that she faced harm to her reputation, self-confidence, and self-esteem. (*Id.* ¶¶ 49–50).

## III.     STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences

against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

Still, the nonmoving party "must do more than simply show that there is some metaphysical

doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts

to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d

Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a

genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159,

166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

The amended complaint asserts (1) claims for disability discrimination and retaliation in

violation of the Rehabilitation Act against SED, and (2) claims for violation of the NYSHRL

against individual defendants Suriano, Tisenchek, Allison, and LaCrosse. (Dkt. No. 14, ¶¶ 66–

76). Defendants move for summary judgment as to all of Plaintiff's claims. (Dkt. No. 52-37).

### A.    Rehabilitation Act Claims

#### 1.    Disability Discrimination

Defendants argue that Plaintiff's disability discrimination claim under the Rehabilitation

Act is subject to summary judgment because: (1) Plaintiff fails to establish a prima facie claim

because she was not "otherwise qualified" to perform the essential functions of her job, (Dkt. No.

52-37, at 20–25); and (2) even if Plaintiff can establish a prima facie claim, SED had a

legitimate, nondiscriminatory reason for initiating disciplinary action against Plaintiff, (*id.* at 25–

29). Plaintiff responds that she is a qualified individual under the Rehabilitation Act, (Dkt. No.

57, at 11–13), and that SED's proffered legitimate, nondiscriminatory reason for adverse action

against her is pretextual, (*id.* at 13–14).

"[S]ummary judgment motions for . . . Rehabilitation Act claims are considered through the burden-shifting framework the Supreme Court handed down in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 541 (N.D.N.Y. 2021). "Under this scheme, the plaintiffs must first establish a prima facie case of discrimination." *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802), *superseded by statute on other grounds*. To establish a prima facie violation of Section 504 of the Rehabilitation Act, a plaintiff must show by a preponderance of the evidence that: "(1) h[er] employer is subject to the [Rehabilitation Act]; (2) [s]he was disabled within the meaning of the [Rehabilitation Act]; (3) [s]he was otherwise qualified to perform the essential functions of h[er] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of h[er] disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020); *see* 29 U.S.C §§ 791(f), 794(d); *see also Clarkson v. Coughlin*, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995) ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act."). A plaintiff must prove that "the discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).

If a plaintiff establishes a prima facie case of disability discrimination by "produc[ing] minimal evidentiary support for the claim of discriminatory motivation," the "burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse employment action." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). If the employer does so, the plaintiff "must 'demonstrate that the proffered reason was not the true reason for the employment decision.'" *Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 54 (E.D.N.Y. 2021) (citation omitted); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169

(2d Cir. 2006) (noting that if a defendant employer proffers "a legitimate non-discriminatory reason for the [adverse action]," the plaintiff "must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext"). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 174 (D. Conn. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

### a.      Prima Facie Case

Defendants challenge Plaintiff's ability to establish a prima facie claim of disability discrimination under the Rehabilitation Act, arguing that Plaintiff cannot show that she was "otherwise qualified" to perform the essential functions of her job given her inability to work with others, insubordination, and documented performance problems. (Dkt. No. 52-37, at 20–25).[12] Plaintiff responds that she is a qualified individual because she "has her master's degree in special education and has worked at NYSED since approximately 2004," getting along with others is not a primary duty of her job, and Defendants point to only one incidence of possible insubordination. (Dkt. No. 57, at 11–12).[13]

In the context of an employment discrimination claim, an individual is "otherwise qualified" for a job if she is "able to perform the essential functions of that job, either with or without a reasonable accommodation." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99–100 (2d Cir. 2003) (citation omitted). Essential functions are the "'fundamental' duties to be

---

[12] Defendants do not challenge, for purposes of their summary judgment motion, that SED is subject to the Rehabilitation Act, that Plaintiff is disabled within the meaning of the statute, or that she suffered an adverse action.

[13] Plaintiff also argues that "her 55-B transfer letter to the Due Process Unit indicates that she meets all the qualifications." (Dkt. No. 57, at 11). This letter is not in the record before the Court.

performed in the position in question, but not functions that are merely 'marginal.'" *Id.* at 100

(citation omitted). Courts "must give considerable deference to an employer's judgment

regarding what functions are essential for service in a particular position." *Id.* (quoting *D'Amico*

*v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998)). However, "[t]he qualification element of

a disability-discrimination claim requires only a minimal showing that the plaintiff possesses the

basic skills necessary for performance of [the] job." *Davis v. Power of Auth. of N.Y.*, No. 19-cv-

792, 2022 WL 309200, at *10, 2022 U.S. Dist. LEXIS 20126, at *25 (S.D.N.Y. Feb. 2, 2022)

(alteration in original) (internal quotation marks and citations omitted), *aff'd*, 2023 WL 3064705,

2023 U.S. App. LEXIS 9933 (2d Cir. 2023). "The qualification prong must not . . . be interpreted

in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in [her] *prima*

*facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision."

*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91–92 (2d Cir. 2001) (explaining that a

plaintiff is only required to establish "basic eligibility for the position at issue," not that her

performance actually "satisfies the employer").[14] Indeed, "especially where discharge is at issue

and the employer has already hired the employee, the inference of minimal qualification is not

difficult to draw." *Id.*

Here, Defendants argue that Plaintiff is not otherwise qualified for her position because

she demonstrated an inability to work with others by engaging in aggressive and threatening

behavior and complaining about her supervisors. (Dkt. No. 52-37, at 21–23); *see Krasner v. City*

---

[14] The Court notes that much of the caselaw cited by Defendants predates the discussion in *Slattery*. Although these older cases discuss a plaintiff-employee's alleged threatening behavior or insubordination in the context of being otherwise qualified for the position, it appears that such points are often more properly considered as part of the defendant's proffer of a legitimate, nondiscriminatory reason for the adverse action. *See Sista*, 445 F.3d at 171–73 (making an "analytical distinction between (i) qualification for a job and (ii) disqualification arising from a legitimate, non-discriminatory, reason for an adverse employment decision" and noting that an individual "may well have the ability to perform job duties, even if her conduct on the job is inappropriate or offensive" (citation omitted)).

*of New York*, No. 11-cv-2048, 2013 WL 5338558, at *11, 2013 U.S. Dist. LEXIS 136534, at

*35–36 (S.D.N.Y. Sept. 23, 2013) ("A disabled individual is not otherwise qualified for a

particular employment position if such individual poses a direct threat to the health or safety of

others which cannot be eliminated by a reasonable accommodation." (citation and internal

quotation marks omitted)).[15] Even assuming the alleged "documented history of harassing and

threatening behavior in the workplace," (Dkt. No. 52-37, at 21), would render Plaintiff otherwise

unqualified, *see supra* note 14, Plaintiff either denies that she threatened anyone or states she

does not recall the altercations, (*see, e.g.*, Dkt. No. 57-8, at 90, 110–11, 114–15, 231–32; Dkt.

No. 57-6, ¶ 34). Thus, viewing the facts in the light most favorable to Plaintiff, the Court cannot

conclude as a matter of law that Plaintiff was not otherwise qualified on the ground that the

alleged threats posed a direct threat to the health or safety of others.

      Defendants next argue that Plaintiff was not otherwise qualified for her position because

she was insubordinate and concedes that she refused to follow a direct order on at least one

occasion, when she refused to provide Tisenchek with the name of the individual she said she

was working with on December 22, 2017. (Dkt. No. 52-37, at 23–24). However, Defendants

provide no authority suggesting that one refusal to follow a supervisor's order, especially in the

context of roughly fourteen years of employment with SED and more than three years in the Due

Process Unit, renders an employee unqualified for a position. *See Sista*, 445 F.3d at 171–72

(noting that a "finding of misconduct" such as "gross insubordination" does not preclude a

plaintiff from "showing her qualification for employment as required by *McDonnell Douglas*"

(citing *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405 (2d Cir. 1991))).

---

[15] Defendants have not provided any authority to support the proposition that complaining about one's supervisor or requesting a transfer renders an employee unqualified for a position.

Similarly, the Court concludes that Defendants' complaints about Plaintiff's work performance do not render Plaintiff not otherwise qualified as a matter of law. Although Plaintiff testified that she "couldn't do" some of tasks when the technology changed, (Dkt. No. 57-8, at 227–28), it is unclear exactly to which tasks Plaintiff is referring and whether those tasks constituted an essential function of her job. By contrast, Plaintiff has offered evidence that she holds an advanced degree and worked at SED from 2004 until 2018, approximately fourteen years. This showing is sufficient to meet the minimal burden imposed by the qualification element. *See Davis*, 2022 WL 309200, at *10, 2022 U.S. Dist. LEXIS 20126, at *24–26 (finding that the plaintiff "possessed the basic skills necessary for performance of the job despite his performance issues" where plaintiff alleged he was qualified based on his bachelor's degree, 25 years of experience in the industry, and professional certification and license); *see also Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("In a discharge case in which the employer has already hired the employee into the job in question . . . the employer itself has already expressed a belief that she is minimally qualified."); *Baron v. N.Y.C. Dep't of Educ.*, No. 06-cv-2816, 2009 WL 1938975, at *5, 2009 U.S. Dist. LEXIS 57515, at *14–15 (E.D.N.Y. July 7, 2009) ("That [the plaintiff] was accepted into the [Teaching Fellows] Program demonstrates that she met its minimum qualifications . . . [and] any issues about her performance bear only on the post-*prima facie* aspects of the *McDonnell Douglas* framework."). A reasonable jury could therefore conclude that Plaintiff had the basic skills necessary to perform in her position. Accordingly, the Court concludes that there is a triable issue of fact as to whether Plaintiff was otherwise qualified to hold her position, and SED is not entitled to summary judgment on Plaintiff's disability discrimination claim on this basis.

The Court must next identify the adverse employment action underlying Plaintiff's Rehabilitation Act disability discrimination claim. Defendants' motion for summary judgment does not dispute that Plaintiff suffered an adverse employment action and addresses (1) the "initiation of disciplinary charges" and (2) a "constructive discharge" in the form of a "forced retirement" as possible adverse actions. (Dkt. No. 52-37, at 25–33).[16] In her opposition, Plaintiff identifies the adverse employment action at issue as "forcing Plaintiff to retire." (Dkt. No. 57, at 13; *see id.* at 14 ("Plaintiff argues that but for the discrimination she faced due to her disability, she would not have been put in a position where she had to retire.")). Although Plaintiff argues that she does not assert a claim for constructive discharge, (*id.* at 14), a plaintiff's claim of involuntary resignation in the face of a threat of termination is analyzed as a constructive discharge claim, *see Green v. Town of East Haven*, 952 F.3d 394, 405 (2d Cir. 2020) (noting that a plaintiff "makes a prima facie showing of an adverse employment action if she adduces evidence from which a rational juror could infer that the employer made her working condition, viewed as a whole, 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign,'" and discussing whether "it was objectively reasonable for an employee to feel compelled to resign in order to avoid being fired" (citation omitted)); *see also Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 178 (E.D.N.Y. 2013) ("[T]hreats of termination may be sufficient to show constructive discharge." (citations omitted)). Here, the notice of discipline served on Plaintiff in July 2018 listed termination as the proposed penalty. The parties do not brief whether a reasonable person in Plaintiff's situation would have felt compelled to resign to avoid being fired. The Court therefore considers

---

[16] Defendants also address a possible hostile work environment claim. (Dkt. No. 52-37, at 29–31). As nothing in Plaintiff's opposition to the motion for summary judgment suggests that she seeks to assert a claim for hostile work environment under the Rehabilitation Act, the Court does not address such a claim further.

Plaintiff's allegedly forced resignation—a constructive discharge—as the adverse action at issue.[17]

### b. Legitimate, Nondiscriminatory Reason for Adverse Action

Once a plaintiff establishes a prima facie case of disability discrimination under the Rehabilitation Act, the burden of production shifts to the defendant "to offer a legitimate, nondiscriminatory rationale for its actions." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016). If the defendant satisfies its burden of production, the presumption of discrimination raised by the prima facie case "is rebutted and drops from the case," such that, at the final stage of the burden-shifting framework, the plaintiff "has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* (citation omitted).

Defendants argue that SED had a legitimate, nondiscriminatory reason for initiating disciplinary action against Plaintiff, which ultimately led to her resignation, because it is undisputed that at least one employee reported to Suriano that Plaintiff had threatened to kill her supervisor on January 10, 2018. (Dkt. No. 52-37, at 26–29). Defendants also argue that it was reasonable for SED to consider Plaintiff's "past history of threatening behavior" as part of its

---

[17] Defendants argue that Plaintiff's constructive discharge claim fails because (1) such a claim is "essentially" an "aggravated hostile work environment claim," which Plaintiff has not made out, and (2) the decision to retire was made after Plaintiff had been on leave from the workplace for approximately ten months. (Dkt. No. 52-37, at 32–33). The cases Defendants cite, however, deal with constructive discharge claims that are premised on unendurable working conditions. *See, e.g.*, *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (noting that the standard for a constructive discharge claim is "higher than the standard for establishing a hostile work environment" where the alleged constructive discharge "stems from an alleged hostile work environment"); *Pa. State Police v. Suders*, 542 U.S. 129, 146 (2004) ("The constructive discharge here at issue *stems from*, and can be regarded as an aggravated case of, sexual harassment or hostile work environment." (emphasis added)). As discussed, a constructive discharge claim might be based on threats of termination, absent other unendurable working conditions, so long as a reasonable person in the plaintiff's position would have felt compelled to resign. *See, e.g.*, *Green*, 952 F.3d at 405 (considering whether "it was objectively reasonable for an employee to feel compelled to resign *in order to avoid being fired*" (emphasis added)); *Dall*, 966 F. Supp. 2d at 178 (noting that "threats of termination may be sufficient to show constructive discharge"); *Morales v. N.Y. State Dep't of Labor*, 865 F. Supp. 2d 220, 245 (N.D.N.Y. 2012) (finding, in the Title VII context, an issue of material fact as to whether the plaintiff was constructively discharged where, inter alia, the plaintiff was issued a notice of discipline stating that she was to be discharged).

justification for taking disciplinary action against her. (*Id.* at 28). Courts routinely hold that threats and threatening behavior constitute a legitimate justification for taking an adverse employment action. *See Sista*, 445 F.3d at 171 (noting that making a threat is a "legitimate, non-discriminatory reason for termination"); *McKinney v. Dep't of Transp., Conn.*, 487 F. App'x 605, 606 (2d Cir. 2012) (summary order) (holding that the plaintiff's "threatening emails" constituted a "legitimate, non-discriminatory reason for terminating" him); *see also Goonewardena v. New York*, 475 F. Supp. 2d 310, 327 (S.D.N.Y. 2007) ("An employer may terminate a disabled employee who, due to that disability, makes an actual threat against another employee where it would terminate any employee for similar acts.").

Accordingly, the Court finds that SED has met its burden of proffering a legitimate, non-discriminatory reason for the initiation of disciplinary charges against Plaintiff, which ultimately concluded in her resignation.

### c.   Pretext

Because SED has articulated a non-discriminatory explanation for its actions, Plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143. "An employee may satisfy this ultimate burden 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)). "[A] plaintiff may rely on evidence comprising her prima facie case . . . together with other evidence such as inconsistent employer explanations, to defeat summary judgment at [the third] stage." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Pretext may be shown by, inter alia, "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the

employer's proffered legitimate" nondiscriminatory reasons for its action. *Id.* at 846. The "key"
is "whether there is sufficient evidence in the record from which a reasonable trier of fact could
find in favor of plaintiff on the ultimate issue" of discrimination. *Griffith v. Metro. Transit Auth.-
N.Y.C. Transit*, No. 19-cv-6234, 2022 WL 16540877, at *4, 2022 U.S. Dist. LEXIS 196813, at
*13 (S.D.N.Y. Oct. 28, 2022) (citation omitted).

Plaintiff argues that SED's proffered reason for initiating disciplinary action is pretext for
its "desire to no longer work with [Plaintiff] due to her disability" because Plaintiff "complained
constantly about the discrimination and harassment she faced" and the report that she threatened
to kill Tisenchek was not credible or corroborated. (Dkt. No. 57, at 13–14). More specifically,
Plaintiff argues that witnesses Rivera, Rookey, and Trimarchi provided "distinct and
incompatible statements" regarding the events of January 10, 2018. (*Id.*). Rivera reported that
Plaintiff said she was going to kill Tisenchek, (Dkt. No. 52-5), Rookey reported that Plaintiff
said she was going to kill herself, (Dkt. No. 52-6), and Trimarchi reported that Plaintiff appeared
"upset about work" but did not report any threatening statements, (Dkt. No. 57-5, at 30).

The Court concludes that there is not evidence in the record from which a reasonable
factfinder could find that SED's stated reason for initiating disciplinary proceedings against
Plaintiff was pretextual and that the real reason was discrimination on the basis of disability.
First, although the three witness statements describe the events of January 10 differently, all
three indicate that Plaintiff was upset. (*See* Dkt. No. 52-5 (Rivera witness statement indicating
that Plaintiff was "yelling"); Dkt. No. 52-6 (Rookey witness statement indicating that Plaintiff
"seemed disgruntled and upset" and "angry and frustrated"); Dkt. No. 57-5, at 30 (Trimarchi
witness statement indicating that Plaintiff appeared "upset about work")). Two of the three
witnesses reported an inappropriate threat. *Cf. Pearson v. Unification Theological Seminary*, 785

F. Supp. 2d 141, 161 (S.D.N.Y. 2011) ("While not every report mentions the water bottle incident or the series of events in identical ways, defendants have been consistent in maintaining that [the plaintiff] acted in a completely unacceptable manner.").

Moreover, Plaintiff concedes that Rivera reported to Suriano that Plaintiff had threatened to kill Tisenchek, that Rookey reported to Suriano that Plaintiff had threatened to kill herself, and that this information was relayed to OHRM. (*See* Dkt. No. 57-1, ¶¶ 44–45).[18] Plaintiff has not pointed to evidence undermining the stated motivation for SED's actions, and the truthfulness of the reports made against Plaintiff is not determinative. *See Duviella v. JetBlue Airways*, 353 F. App'x 476, 477 (2d Cir. 2009) (summary order) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what 'motivated the employer.'" (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006))); *Hart v. N.Y. Univ. Hospitals Ctr.*, No. 09-cv-5159, 2011 WL 4755368, at *8, 2011 U.S. Dist. LEXIS 116538, at *23–34 (S.D.N.Y. Oct. 7, 2011) (concluding that the plaintiff's interpretation of his conduct was immaterial as a matter of law and that he had not satisfied his ultimate burden of proving that discrimination was the real reason for his termination); *Murphy v. Bd. of Educ. of Rochester City Sch. Dist.*, 273 F. Supp. 2d 292, 309 (W.D.N.Y. 2003) ("While plaintiff denies that he ever threatened to hurt a student, there is no dispute that [the principal] reported to the District's human resources department that [the plaintiff] had made such statements, and it was certainly appropriate under the circumstances to suspend plaintiff pending an investigation." (internal footnote omitted)).

---

[18] Plaintiff also concedes that, prior to January 10, 2018, other employees at SED had reported on multiple occasions that Plaintiff acted in a harsh, aggressive, or violent manner, although she denies the underlying incidents. (*See* Dkt. No. 57-8, at 90, 110–11, 114–15, 231–32). The Court also notes that the notice of discipline recounted some of Plaintiff's "work record" with SED, including prior incidents of alleged "threatening" or "unprofessional" behavior. (Dkt. No. 52-9, at 4).

Significantly, Plaintiff has not presented any evidence that any individual involved in the decision to initiate disciplinary proceedings against her was motivated by any impermissible discriminatory intent. "[A]n employer's intent to discriminate must be evaluated by reference to the decision-maker actually ordering the adverse employment action." *Payne v. PSC Indus. Outsourcing, LP*, 139 F. Supp. 3d 536, 547 (D. Conn. 2015) (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 89 (2d Cir. 2005)). Defendants assert that OHRM conducted the interrogation of Plaintiff and filed a notice of discipline against her. (Dkt. No. 52-3, ¶ 18 (Franchini declaration)). The record evidence indicates that none of the individual defendants was involved in the decision to file disciplinary charges. (*See* Dkt. No. 52-1, ¶ 8 (Allison declaration asserting that she left her position with SED in early 2018 and was "not involved in the commencement of disciplinary charges against [Plaintiff], or the resolution of those charges"); Dkt. No. 52-13, ¶ 19 (LaCrosse declaration asserting: "I was not involved in the decision to . . . initiate disciplinary charges, nor was I informed of any such decision[] in advance."); Dkt. No. 52-15, ¶ 16 (Suriano declaration asserting: "I had no involvement in the investigation or in any initiation of disciplinary charges against [Plaintiff]."); Dkt. No. 52-17, ¶ 42 (Tisenchek declaration stating: "I was not involved in any decision to . . . initiate disciplinary charges.")). And Plaintiff has not offered any evidence identifying the decision-maker or as to who initiated the disciplinary proceedings against her. Thus, because Plaintiff has not presented any evidence that the decision-maker, whoever that individual was, was motivated by an intent to discriminate, there is not evidence from which a reasonable factfinder could find SED's articulated reason to be pretextual. *Cf. Payne*, 139 F. Supp. 3d at 547–48 (concluding that the plaintiff's claims of pretext were "fatally undermine[d]" where the plaintiff did not make any allegation concerning the

motives of the higher-level supervisor who terminated him, "let alone that [the supervisor] was motivated by a discriminatory animus").

Accordingly, the Court grants SED's motion for summary judgment on Plaintiff's Rehabilitation Act disability discrimination claim.

### 2.     Retaliation

SED argues that Plaintiff's retaliation claim under the Rehabilitation Act is subject to summary judgment because Plaintiff has not demonstrated that she engaged in protected conduct, and, even if she could, Plaintiff fails to demonstrate the requisite causal connection between such protected conduct and any alleged adverse action. (Dkt. No. 52-37, at 33–35). Plaintiff responds that her December 28, 2017 email and January 10, 2018 conversation with Rivera constitute protected activity, and that Plaintiff can demonstrate causation through temporal proximity and "ample evidence that retaliation was the motivating factor in Plaintiff's psychological evaluation." (Dkt. No. 57, at 14–17).

To establish a retaliation claim under Section 504 of the Rehabilitation Act, a plaintiff must show that: (1) she engaged in protected activity; (2) the defendant was aware of this activity; (3) the defendant took an adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. *See Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002). A retaliation claim is analyzed under the same three-part *McDonnell Douglas* burden shifting framework as discrimination claims. *See Conklin v. U.S. Immigr. & Customs Enf't*, No. 20-cv-8178, --- F. Supp. 3d ---, 2023 WL 2537665, at *17, 2023 U.S. Dist. LEXIS 44795, at *52 (S.D.N.Y. Mar. 16, 2023).

### a.     Protected Activity

Protected activity is "action taken to protest or oppose statutorily prohibited discrimination." *Natofsky*, 921 F.3d at 354 (citation omitted). The "underlying conduct about

which the plaintiff complains need not actually be unlawful so long as plaintiff possessed a good

faith, reasonable belief that the challenged action violated the law." *Frantti v. New York*, 414 F.

Supp. 3d 257, 290–91 (N.D.N.Y. 2019) (citation omitted). To constitute protected activity, a

plaintiff's complaint "must be sufficiently pointed to be reasonably understood as a complaint of

discrimination." *Cain v. Mandl Coll. of Allied Health*, No. 14-cv-1729, 2015 WL 3457143, at *6,

2015 U.S. Dist. LEXIS 69895, at *19 (S.D.N.Y. May 29, 2015) (citation omitted). Further, the

Second Circuit has held that a request for a reasonable accommodation constitutes protected

activity under the Rehabilitation Act and ADA. *Weixel*, 287 F.3d at 149.

      Here, Plaintiff first points to the December 28, 2017 email she sent to Suriano, LaCrosse,

and Rivera as protected activity.[19] In this email Plaintiff requested to be removed from any Due

Process Unit meetings "due to abuse, harassment and mismanagement of a bullying supervisor."

(Dkt. No. 52-16, at 57). Plaintiff also stated that she would not attend a scheduled staff meeting

"due to request by a doctor in a fifty-five B in place with the Office of Civil Service due to

extreme vomiting under stressful situations and paralysis." (*Id.*). Although Plaintiff's email

arguably makes no connection between her references to "abuse," "harassment," and "bullying"

and her disability, the Court concludes that a reasonable factfinder could find that Plaintiff's

email constitutes a request for an accommodation of her disability. *Cf. Conklin*, 2023 WL

2537665, at *19, 2023 U.S. Dist. LEXIS 44795, at *59–60 ("Although Plaintiff's phrasing is

---

[19] Defendants focus on Plaintiff's December 27, 2017 email to Tisenchek, LaCrosse, and Suriano, rather than the December 28 email. (*See* Dkt. No. 52-37, at 33–34). This email mentions "bullying" and "harassment" in the context of Tisenchek's questioning Plaintiff's attendance and timesheet but otherwise makes no mention of any claimed disability, signs or symptoms of a disability, or Plaintiff's 55-b status. (*See* Dkt. No. 52-29, at 1–2). Thus, the Court agrees with Defendants that this email does not constitute protected activity under the Rehabilitation Act, as Plaintiff cannot have had a good faith, objectively reasonable belief that she was complaining about bullying or harassment due to her disability; nor would the recipients of the email have reasonably understood her to be complaining of statutorily proscribed conduct. *See, e.g.*, *Cain*, 2015 WL 3457143, at *6–7, 2015 U.S. Dist. LEXIS 69895, at *20–21 (noting that, as a general matter, a plaintiff does not state a retaliation claim "if she does not allege that she was being harassed *on account of her disability*" (emphasis added) (citing *Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 234 (E.D.N.Y. 2015))).

unclear, a reasonable jury could, construing the assertions in the light most favorable to Plaintiff as the non-moving party, understand the[] transfer requests as a request for accommodation for his disability."). Plaintiff states in the email that she will not attend a meeting due to a doctor's request, and she mentions her 55-b status and specific signs of her disability, including vomiting and paralysis. (Dkt. No. 52-16, at 57; *see also* Dkt. No. 57-6, ¶ 30 (Plaintiff explaining that she requested not to attend a staff meeting so as to "not exacerbate [her] disability")). Thus, because requests for accommodations are protected activity under the Rehabilitation Act, there is evidence from which a reasonable factfinder could conclude that Plaintiff's December 28, 2017 email was protected activity.

The Court reaches a different conclusion with respect to Plaintiff's January 10, 2018 conversation with Rivera. According to Plaintiff's version of events, Plaintiff, who concededly was upset at the time, told Rivera that Tisenchek had "been on [her] back" and that Plaintiff was "at the end of [her] rope." (Dkt. No. 57-8, at 247–49; Dkt. No. 57-6, ¶ 32). Plaintiff requested that Rivera ask Suriano to "do something about Tisenchek and keep her away" from Plaintiff. (Dkt. No. 57-6, ¶ 32). Nothing in Plaintiff's comments makes any reference to her disability or 55-b status or otherwise suggests that her complaints about Tisenchek were of unlawful behavior on account of disability. Thus, even construed in the light most favorable to Plaintiff, her conversation with Rivera is too vague to constitute protected activity. *Cf. Conklin*, 2023 WL 2537665, at *19, 2023 U.S. Dist. LEXIS 44795, at *57–58 (concluding that the plaintiff's assertion that he "became emotionally distraught" and "discussed [his] concerns" with a supervisor were too vague to make out protected activity); *see also Hatch v. Brennan*, 792 F. App'x 875, 879–80 (2d Cir. 2019) (summary order) (noting that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or

could reasonably have understood, that the plaintiff's opposition was directed a conduct prohibited by [the Rehabilitation Act]" and holding that none of the plaintiffs' communications "could conceivably have alerted the Postal Service to the fact that their grievances pertained to treatment based on a protected class").[20]

Accordingly, the Court will consider Plaintiff's December 28, 2017 email as protected activity for purposes of her Rehabilitation Act retaliation claim.

### b.   Causation

The required causal connection in a retaliation claim "can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Natofsky*, 921 F.3d at 353 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015)). Although temporal proximity between the protected activity and the adverse action may suffice to establish a prima facie claim of retaliation, temporal proximity "alone is insufficient to defeat summary judgment at the pretext stage." *Clark v. Coca-Cola Beverages Ne., Inc.*, No. 20-cv-4040, 2022 WL 92060, at *5, 2020 U.S. App. LEXIS 657, at *14 (2d Cir. Jan. 10, 2022) (summary order) (quoting *Kwan*, 737 F3d. at 847).

Here, Defendants argue that, even if Plaintiff can demonstrate protected activity and that "SED knew of such conduct," Plaintiff's retaliation claim fails because SED had a legitimate,

---

[20] Further, even if Plaintiff's statements were protected activity or accepting Plaintiff's argument that the "message" was "intended for Suriano who knew the relationship between the harassment and [Plaintiff's] [55-b] status," (Dkt. No. 57, at 16), there is no evidence in the record that Rivera reported anything to Suriano other than that Plaintiff had threatened Tisenchek. There consequently is no evidence that any alleged retaliator was aware of any protected statements Plaintiff may have made to Rivera. *See Weixel*, 287 F.3d at 148 (listing as an element of a Rehabilitation Act retaliation claim that "the alleged retaliator knew that plaintiff was involved in protected activity").

nonretaliatory reason for initiating disciplinary proceedings against Plaintiff "based upon reports from fellow colleagues that she threatened her supervisor on January 10, 2018." (Dkt. No. 52-37, at 34).[21] Plaintiff responds that proof of causation is "not limited to temporal proximity" and that "there is ample evidence that retaliation was the motivating factor in Plaintiff's psychological evaluation," without specifying what that evidence is. (Dkt. No. 57, at 16–17).[22] The Court agrees with Defendants that they have articulated a legitimate, nonretaliatory reason for calling the Albany Mobile Crisis Unit, absenting Plaintiff from the workplace, and/or initiating disciplinary proceedings against Plaintiff.[23] Further, for substantially the same reasons that Plaintiff's disability discrimination claim fails, *supra* Section IV.A.1.c., there is not evidence from which a reasonable factfinder could find that SED's articulated reasons were pretextual and that the true reason for any of those actions was retaliatory animus for the December 28, 2017 email. *See Clark*, 2022 WL 92060, at *5, 2022 U.S. App. LEXIS 657, at *14 (affirming grant of summary judgment on retaliation claim for "substantially the same reasons discussed in connection with [the plaintiff's] discrimination and failure to accommodate claims" where the plaintiff provided "no other circumstantial or direct evidence to support his retaliation claim"

---

[21] Defendants do not appear to contest that Plaintiff can satisfy the causation element of her prima facie retaliation claim based on temporal proximity, as only approximately two weeks passed between Plaintiff's protected activity on December 28, 2017 and the initiation of the investigation into the alleged threats on January 11, 2018.

[22] Plaintiff suggests that she "complained to superiors about her treatment" from the beginning of her time in the Due Process Unit, (Dkt. No. 57, at 16), but does not explain how that is evidence that SED retaliated against her specifically for the December 28, 2017 email. To the extent Plaintiff claims that she was retaliated against for her prior complaints, she has not pointed to any prior complaint that could reasonably be construed as a complaint of disability discrimination.

[23] Plaintiff's opposition appears to consider her "psychological hospitalization and evaluation" to be the adverse action for purposes of her Rehabilitation Act retaliation claim. (*See* Dkt. No. 57, at 16–17). Although Allison, in consultation with Franchini, was the one who called the Albany Mobile Crisis Unit, Defendants reply that they are not responsible for Plaintiff's psychiatric admission to the hospital, which is governed by standards set forth in the Mental Hygiene Law. (Dkt. No. 59, at 11–12). Regardless of whether the Court frames the adverse action as SED's decision to call the Albany Mobile Crisis Unit, absent Plaintiff from the workplace, and/or initiate disciplinary proceedings which ultimately led to her resignation, Plaintiff has not pointed to evidence from which a reasonable factfinder could find SED's stated reason for doing so is pretext for retaliation for the December 28, 2017 email.

other than temporal proximity). Because temporal proximity, without more, is insufficient to defeat summary judgment at the pretext stage, SED is entitled to summary judgment on Plaintiff's Rehabilitation Act retaliation claim.

Accordingly, the Court grants SED's motion for summary judgment on Plaintiff's Rehabilitation Act retaliation claim.

**B.    NYSHRL Claims**

Defendants argue that, insofar as SED is entitled to summary judgment on all of Plaintiff's federal claims, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. (Dkt. No. 52-37, at 35). Plaintiff responds that the Court should exercise its discretion to retain supplemental jurisdiction over the state-law claims, which are based on the same facts as the federal claims. (Dkt. No. 57, at 17).

Having dismissed Plaintiff's Rehabilitation Act claims, the Court declines, in its discretion, to retain supplemental jurisdiction over Plaintiff' NYSHRL claims. *See* 28 U.S.C. § 1367(c)(3). When deciding whether to exercise supplemental jurisdiction, courts consider "the values of judicial economy, convenience, fairness, and comity." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013) (citation omitted). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Courts "commonly decline to exercise supplemental jurisdiction after awarding defendants summary judgment on plaintiffs' federal claims." *Martin v. Sprint United Mgmt. Co.*, No. 15-cv-5237, 2017 WL 5028621, at *3, 2017 U.S. Dist. LEXIS 180395, at *10–11 (S.D.N.Y. Oct. 31, 2017) (collecting cases); *Sotak v. Bertoni*, 501 F. Supp. 3d 59, 86 (N.D.N.Y. 2020) ("Because summary judgment will be granted as to the [federal] claims, the continued exercise

of supplemental jurisdiction over [the plaintiff's] state law claims will be declined."). Because

this is a "usual case in which all federal-law claims are eliminated before trial" that presents no

exceptional circumstances, *Cohill*, 484 U.S. at 350 n.7, the Court declines to exercise

supplemental jurisdiction over Plaintiff's state-law claims and dismisses those claims without

prejudice.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 52) is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's Rehabilitation Act disability discrimination and retaliation

claims against Defendant New York State Education Department are **DISMISSED with**

**prejudice**; and it is further

**ORDERED** that Plaintiff's New York Human Rights Law claims against Defendants

Christopher Suriano, Cathryn Tisenchek, Cassandra Allison, and Joanne LaCrosse are

**DISMISSED without prejudice**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated:  August 21, 2023
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

38